IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CHARLES C. HARBISON,

     Petitioner,

v.                              Civil Action No. 3:14CV687

HAROLD CLARKE,

     Respondent.

## MEMORANDUM OPINION

Charles C. Harbison, a Virginia state prisoner proceeding with counsel, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1). Following a guilty plea in 2002 in the Circuit Court for the County of Chesterfield, Harbison was convicted of first-degree murder of William Bouchier, abduction, robbery, conspiracy to rob, and use of a firearm in the commission of a felony. The prosecution relied upon Virginia's felony murder statute in charging and convicting Harbison of first degree murder. Indictment at 1, Commonwealth v. Harbison, CR02F00428-03 (Va. Cir. Ct. Mar. 18, 2002) (citing Va. Code Ann. § 18.2-32.) A defendant is guilty of first degree murder under section 18.2-32 of the Virginia Code where the killing occurs "in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate or animate object sexual penetration, robbery, burglary or abduction." Va. Code Ann. § 18.2-32 (West 2015). "The felony murder statute applies 'where

the initial felony and the homicide were parts of one continuous transaction, and were closely related in point of time, place, and causal connection.'" Turner v. Commonwealth, 717 S.E.2d 111, 123 (Va. 2011) (quoting Haskell v. Commonwealth, 243 S.E.2d 477, 482 (1978)). Furthermore, where two or more parties engage in criminal concert of action, one who participates in the initial robbery giving rise to the homicide may be found guilty of murder whether or not he was the one who actually dealt the lethal stroke. See Rollston v. Commonwealth, 399 S.E.2d 823, 828 (Va. 1991) (recognizing the application of concert of action in felony murder cases).

Respondent moves to dismiss, inter alia, on the ground that the one-year statute of limitations governing federal habeas petitions bars the § 2254 Petition. Harbison concedes that his petition is untimely under the statute of limitations governing 28 U.S.C. § 2254 petitions. (§ 2254 Pet. 10.) Nevertheless, Harbison asserts that the Court can examine the merits of his claims because he is actually innocent of the crimes to which he pled guilty. See McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013) ("Actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . [or] expiration of the statute of limitations.") For the reasons set forth below, the Court

2

rejects Harbison's assertion of actual innocence and grants the Motion to Dismiss (ECF No. 4).

## I.   PERTINENT PROCEDURAL HISTORY

On October 22, 2002, Harbison pled guilty to the charges discussed above.  (Oct. 22, 2002 Tr. 9-12.)   On May 29, 2003, Harbison moved to withdraw his guilty pleas.  Motion to Withdraw Guilty Pleas Prior to Sentencing at 1-2, Commonwealth v. Harbison, Nos. CR02F00428-01 through CR02F00428-06 (Va. Cir. Ct. filed May 29, 2003).   That same day, Harbison withdrew his Motion to Withdraw Guilty Pleas and the Circuit Court sentenced Harbison to an active term of imprisonment of forty-three (43) years. (May 29, 2003 Tr. 3, 15-16.)

Thereafter, Harbison, with new counsel, filed another Motion to Withdraw his Guilty Plea.  Motion to Withdraw Guilty Plea at 1-11, Commonwealth v. Harbison, Nos. CR02F00428-01 through CRF0200428-06 (Va. Cir. Ct. filed Aug. 4, 2003).   On October 27, 2003, the Circuit Court denied the Motion to Withdraw the Guilty Plea because too much time had passed and it lacked jurisdiction.  (Oct. 27, 2003 Tr. 11-12.)   Harbison did not file an appeal.

On or about May 14, 2004, Harbison filed a petition for writ of habeas corpus with the Circuit Court.  (§ 2254 Pet. Ex. 23, at 1, ECF No. 1-26.)   On March 21, 2005, the Circuit Court denied the petition.  (Id. Ex. 24, at 2, ECF No. 1-27.)

Harbison appealed.   The Supreme Court of Virginia refused Harbison's petition for appeal.   (Id. Ex. 25, at 1, ECF No. 1-28.)

On October 8, 2014, Harbison filed his present § 2254 Petition.

## II.   ACTUAL INNOCENCE STANDARD

"Claims of actual innocence, whether presented as freestanding ones, see Herrera v. Collins, 506 U.S. 390, 417 (1993), or merely as gateways to excuse a procedural default, see Schlup v. Delo, 513 U.S. 298, 317 (1995), should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) (parallel citations omitted).   Here, the Court reviews Harbison's assertion of innocence under the more lenient standard for gateway claims because Harbison's actual innocence claim would allow the Court to consider his otherwise time-barred claims.   McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013).

A gateway claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324.   "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Id.

4

If a petitioner meets the burden of producing new, truly reliable evidence of his innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial'" and determines whether the petitioner has met the standard for a gateway claim of innocence. House v. Bell, 547 U.S. 518, 538 (2006) (quoting Schlup, 513 U.S. at 327-28). The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Sharpe v. Bell, 593 F.3d 372, 377 (4th Cir. 2010) (quoting Schlup, 513 U.S. at 327-28).

It is doubtful that Harbison has produced any truly reliable evidence of his innocence to warrant going to the second step of the actual innocence inquiry. Nevertheless, as explained below, when one considers all the evidence, old and new, he fails to demonstrate that no reasonable juror would have found him guilty beyond a reasonable doubt.

## III. ANALYSIS

### A. Preliminary Summary Of The Evidence Regarding Harbison's Crimes

The Commonwealth's evidence of Harbison's guilt reflected that Brandi Dalton and Chris Harbison devised a plan to lure Billy Bouchier to Dalton's home and rob Bouchier of money and

drugs. (Oct. 22, 2002 Tr. 29.)[1] "On the evening of December 6, 2001, [Michael Brooks], his sister Kia Brooks (Brooks), Charles Harbison, Herbert Brown, and Gerald Walker visited Brandi Dalton's Chesterfield County home, which she shared with Jennifer Skiles and another woman." Brooks v. Commonwealth, No. 1629-03-2, 2004 WL 1315323, at *1 (Va. Ct. App. June 15, 2004). At some point, "Dalton contacted Bouchier by telephone to lure him to her home." Id.

> When Dalton announced Bouchier was a few minutes away from the house, [Michael Brooks], Harbison, Brown, and Walker arose and walked down the hallway. [Kia] Brooks went to the downstairs bathroom. From the bathroom, Brooks heard the front door open and shut and the sound of footsteps going upstairs. She heard thumping, stomping, and a yell. [Kia] Brooks testified, "All I heard was noise . . . other than Mr. Bouchier's noise, nothing." Eventually, Dalton came to the bathroom and took [Kia] Brooks upstairs to Dalton's bedroom.
>
> [Kia] Brooks saw Bouchier lying face down on Dalton's bed with a pillowcase over his head. Harbison was putting his weight on Bouchier to restrain him. Harbison kept asking Bouchier about money and a code. Dalton told Bouchier to "tell them what they want to know." [Michael Brooks] was standing behind Harbison. At one point, Harbison picked up Bouchier and slammed him on the bed. [Michael] Brooks assisted by placing duct tape around Bouchier's ankles.
>
> Dalton said she wanted to get Bouchier out of the house. Harbison and Brown picked up Bouchier and took him to the hallway. Bouchier stood beside Harbison "for a minute." [Kia] Brooks saw blood on the

---

[1] The summary of the evidence comes from the transcript of Harbison's guilty plea and the Court of Appeals of Virginia's summary of the evidence pertaining to the guilt of one of Harbison's codefendants, Michael Brooks. The Court notes that the parties and the courts spell Dalton's first name as "Brandi" or "Brandy."

pillowcase covering Bouchier's head although she saw
no blood in the hallway at that time.

[Kia] Brooks later observed Bouchier being
"walked down" the stairs. When [Michael] Brooks went
outside, she saw that Bouchier had been placed in the
hatchback area of his own car.

[Michael Brooks], with Harbison and Bouchier as
passengers, drove Bouchier's car away from Dalton's
residence.  Brooks and Dalton followed in a separate
car as [Michael Brooks] led them to a remote site on
Duval Road.  [Michael Brooks], Harbison, and Dalton
got out of the vehicles and stood together beside
Bouchier's car.  The hatchback of the car was open.
[Michael Brooks] instructed Brooks to position the
vehicle she was driving to face the exit route.
Brooks then observed Dalton walk to the rear of
Bouchier's car and shoot Bouchier five times with a
pistol.  [Michael Brooks], Harbison, and Dalton
quickly entered Brooks' vehicle.  Harbison asked
Dalton if she was sure Bouchier was dead.  Dalton
said, "He squirmed like a worm."  [Michael Brooks]
commented, "I didn't think you would do it."

[Kia] Brooks drove the group to Dalton's
residence.  Dalton and Harbison cleaned Dalton's
bedroom and the upstairs of the house.  They removed
Dalton's bedding, the hallway blinds, and a carpet and
placed the items in trash bags.  They took the bags to
Harbison's home, and Harbison subsequently burned
them.  [Kia] Brooks dropped off [Michael Brooks] at
the home of his girlfriend.

Earlier that evening, after smoking marijuana
with the group, Skiles had gone to her bedroom and
remained there with the door closed.  At one point,
she heard thumping, looked out the door, and saw
Walker entering Dalton's bedroom.  Later that night,
after the rest of the group had left the house, Skiles
saw blood on Dalton's bedroom door, the bathroom door,
the closet doors, walls, a clothes hamper, blinds, and
carpeting.

. . . .

Bouchier's dead body was found in the rear of his
vehicle the following day at the site on Duval Road.
Bouchier had been shot five times, each of them a
lethal wound.  Three of the wounds were to the right
side of the head.  The other two gunshot wounds were
to the chest and abdomen.

When the body was found, Bouchier's head was
covered with a pillowcase that had two bullet holes in

it.   The pillowcase was secured with duct tape above Bouchier's mouth.   Around Bouchier's head and under his body was a sheet with one bullet hole in it.   What appeared to be spots of blood were on Bouchier's pants and socks.

The medical examiner opined that each of the three head wounds would have "result[ed] in instant fatality, instant incapacitation." Had Bouchier received any of these wounds while inside the house, he would have been unable to walk.   The medical examiner further opined that if Bouchier had been shot in the chest inside the house, he "would have been able to stand for only a very short time."   Bouchier also had suffered a number of superficial blunt force injuries, none of which would have produced significant bleeding or contributed to his death.

(Id. at *1-2.)

## B.   Harbison's Theory Of His Innocence

Harbison asserts that the sum of old and new evidence

reflects that:

. . . Bouchier was shot behind the ear and killed in Brandi Dalton's room before the pillowcase was taped over his head and before he was removed from Brandi Dalton's room, and that Harbison was not present when this occurred.   The evidence specifically shows the following.

Kia Brooks picked up Harbison and took him to Brandi Dalton's house.   Harbison left at around 9 p.m. when Anthony Adkins picked him up to take him to Torei Rock's house.   After staying at Torei Rock's for around an hour, Harbison was again picked up by Anthony Adkins and driven back to Brandi Dalton's house.   They stopped at a gas station on the way and were seen by Amber Miles.   Sometime after Harbison arrived back at Brandi Dalton's house, he went upstairs and found Brandi Dalton, Michael Brooks and Jerald Walker in the bedroom with Bouchier's dead body.

At this point, in some misguided devotion to Brandi Dalton, Harbison helped wrap Bouchier's body up.

(§ 2254 Pet. 22.)

In support of the foregoing theory, Harbison relies upon, _inter_ _alia_, statements from himself, Brandi Dalton, Michael Brooks, Kia Brooks, and snippets of the records from the trials of Michael Brooks and Brandi Dalton.

### C.   Harbison's Evidence Of His Innocence

In his affidavit, Harbison explains why he pled guilty. (§ 2254 Pet. Ex. 2, at 1-3.)   Harbison's affidavit, however, contains no "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" that supports his innocence.   Schlup v. Delo, 513 U.S. 298, 324 (1995).

### 1.   Harbison's Evidence To Support An Alternative Scenario Of Bouchier's Murder

First, Harbison tenders a notarized letter from Michael Brooks, dated June 10, 2004, wherein Michael Brooks asserts that he wishes to reveal "the full truth" of what happened on the night of Bouchier's murder.   (§ 2254 Pet. Ex. 7, at 1, ECF No. 1-10.)[2] Michael Brooks asserts that he is "tired of covering for" his sister, Kia Brooks.   (Id. at 2.)

Michael Brooks asserts that, around, 6:30 p.m. on December 6, 2001, he and his sister "Kia picked Chris up" and went to Brandi's house.   (Id. at 3.)   They arrived at Brandi's house at about 6:45 p.m.   (Id.)   Herb Brown and Gerald Walker arrived

---

[2] The Court corrects the capitalization in the quotation to the parties' submissions.

around 7:45 p.m.   (Id.)   Michael Brooks claims that Harbison left Brandi's house at about 9:00 p.m. and said that he was going to look for marijuana. (Id. at 4.)   Around 10:00 p.m., Bouchier arrived and Brandi took him upstairs.   (Id.)   Michael Brooks stayed downstairs and listened to music.   (Id. at 4-5.) About 10:30 or so, Brooks was "startled by what sounded like a loud pop." (Id. at 5.)   Brandi then came "racing down the stairs with a gun in her hand screaming" for Brooks to help her. (Id. at 5.)   Brooks then followed Brandi upstairs because he was afraid she would shoot him.  (Id. at 5-6.)

Upon arriving upstairs, Michael Brooks saw Gerald Walker wrapping up Bouchier in a sheet.  (Id. at 6.)   Bouchier appeared to be dead.   (Id.)   "It was about this time that [Harbison] burst into the room . . . and asked [Michael Brooks] what the hell had went on in here."   (Id.)   Brandi then told Michael Brooks and Harbison they had to help get Bouchier's body out of the house.   (Id. at 6-7.)  Michael Brooks claims that he helped dispose of Bouchier's body because he feared Brandi might shoot him or his sister.  (Id. at 7-8.)

Michael Brooks asserts that right before they dumped Bouchier's body, Brandi Dalton shot Bouchier four more times. (Id. at 9.)

## 2.    Harbison's Evidence To Support An Alibi

Anthony   Adkins   provides   some   support   for   Harbison's assertion that he was absent during the actual murder of Bouchier,   and   only   arrived   at   Brandi   Dalton's   home   after Bouchier had been killed.   Specifically, Adkins swears:

> After I ran some errands, I called Charles at around 6:00 p.m. and asked him if he still needed a ride.  He said, "Yes," but told me he[ ] would be at a friend's house and asked me to pick him up from there. Charles then gave me directions to where he would be. I told him I would be there around 9:00 p.m.
>
> A little after 9:00 p.m., I picked Charles up from the neighborhood he gave me directions to, which was across the street from Salem Church Middle School. Charles met me on a road in the neighborhood, he was by himself.
>
> Charles told me he needed to go to a friend's house whose name is Torei, and that he needed to be dropped off there.  He then told me that he needed to be picked back up in an hour.  I dropped him off at a house off of Lucks Lane, and I went to Hooters to get something to eat.
>
> I returned to the same house to pick Charles up about an hour and a half later.  Charles wanted to stop and buy some cigarettes.  So, we stopped at a gas station on the corner of Lucks Lane and Courthouse Road.  From there I drove him back to the neighborhood I originally picked him up from.  Charles told me he would call me the next day, but never did.  I found out days later that he and others had been arrested for murder.
>
> At no time had any attorney or representative of Charles Christopher Harbison ever contacted me prior to his trial to ask me about any information I had in reference to the events that took place on December 6, 2001.  But had they contacted me, I would have testified to what I have submitted in this affidavit.

(§ 2254 Pet. Ex. 10, at 1 (punctuation and spacing corrected)
(paragraph numbers omitted), ECF No. 1-13.)[3]

Torei Rock corroborates Adkins's assertion that Harbison
was at Rock's home on the evening of December 6, 2001.
Specifically, Rock swears that around 9:15 p.m. on December 6,
2001,

> Chris came to my house. I'm not sure who took him to
> my house.  We sat around and talked and had a few
> beers.  Chris said he couldn't find any marijuana at
> Brandi's house, but that he was going back to Brandi's
> and maybe he could find some later.  Chris stayed at
> my house for an hour and a half, maybe two hours.
> Chris's ride beeped the horn to let Chris know he was
> outside, and Chris left.  It was dark, but from the
> window, I could see Chris get into the car.  I did not
> hear from Chris again that night.

(Id. Ex. 11, at 1, ECF No. 1-14.)

### 3.  Forensic Evidence

Jennifer Skiles, Karen Jones and Kia Brooks all testified
to seeing a large amount of blood in the bedroom at Brandi
Dalton's house.  (See, e.g. ECF No. 1-32, at 29-30.)  During
Brandi Dalton's trial, the prosecution entered into a
stipulation acknowledging that, "[t]he time of death of the
victim is unknown" and, "[t]he blunt force trauma, beating,
[and] injuries [Bouchier sustained] are not consistent with any
substantial loss of blood."  (§ 2254 Pet. Ex. 13, at 1, ECF No.
1-16.)  The stipulation further provided that Bouchier sustained

---

[3] Amber Miles swears that she saw Adkins and Harbison at a
service station, sometime after dark on the night of December 6,
2001.  (§ 2254 Pet. Ex. 12, at 1, ECF No. 1-15)

five (5) gunshot wounds and that "[a]ny one of the five gunshot wounds or all five could have been inflicted in the house." (Id.) The stipulation also stated that, "the victim would have been able to stand on his own only if the only wound he sustained was the gunshot wound to the heart. He would have been able to stand for only a very short period of time." (Id.)[4]

Harbison suggests that this evidence tends to indicate that Brandi Dalton killed Bouchier in her home and is consistent with Harbison's current story that, when he reappeared at Dalton's home, Bouchier already was dead. Harbison has produced an unsworn letter from Kia Brooks wherein she states that she now "believe[s] [Bouchier] was shot inside the house . . . ." (ECF No. 10-2, at 1.) Kia further states she is now more familiar with sound of gunshots and that the thud she heard the night of the murder might have been a gunshot. (Id.) She also states she stuck to her initial testimony because of pressure from the prosecutor. (Id.) Additionally, Kia states that when she swore that Harbison took Bouchier downstairs, she meant Harbison carried Bouchier down the stairs, because she now believes

---

[4] Bouchier's autopsy report reflects that soles of Bouchier's socks are stained with spots of blood. (§ 2254 Pet. Ex. 15, at 1, ECF No. 1-18.)

Bouchier "died at the top of the stairs or a little ways down." (Id.)[5]

### 4.   Brandi Dalton's Statement Regarding The Murder

Harbison also has produced a recording of a phone call that Brandi Dalton made to Harbison's father from jail in 2002. (§ 2254 Pet. Ex. 31, ECF No. 1-34.)  The recording does little to advance Harbison's claim of innocence.  In that call, Brandi tells Harbison's father that Michael Brooks, rather than she, shot Bouchier at her home.  (Id. at 5 (as paginated by CM/ECF.) While attempting to comfort Harbison's father about Harbison's minor role in the crime, she acknowledges that Harbison was present in the home when Gerald Walker beat up Bouchier and attempted to rob him.  (Id. at 7.)

### D.   Additional Evidence Of Harbison's Guilt

While some confusion exists about when Bouchier was first shot and who pulled the trigger, as explained below, the evidence overwhelmingly demonstrates that Brandi Dalton and Harbison participated in the plan to rob Bouchier and Bouchier's murder was the product of that plan.

---

[5] Harbison also has submitted affidavits from his mother and father wherein they swear that Kia Brooks testified falsely at Harbison's preliminary hearing when she testified that she did not pick Harbison up at their home on December 6, 2001.  (See § 2254 Pet. Exs. 8-9, ECF Nos. 1-11, 1-12.)

### 1.   Harbison's Initial Statement To The Police

Although Harbison now suggests that he reappeared at Brandi's house moments after Bouchier was killed and was unaware of any plan to rob Bouchier, that is not the version of the facts that he first told the police. Shortly after Bouchier's murder, the Chesterfield Police interviewed Harbison. (Dec. 19, 2001 Tr. 1.)

He said that Harbison told the police that he arrived at Dalton's house at 6:00 p.m. on December 6, 2001. (Dec. 19, 2001 Tr. 50.) By 9:00 p.m., Brandi had called Bouchier and several other men already had arrived at the house. (Dec. 19, 2001 Tr. 53-57.) Bouchier arrived between 9:00 and 9:30 p.m. and went upstairs with Brandi. (Dec. 19, 2001 Tr. 57.) Harbison admitted that when Bouchier went upstairs, Harbison "knew they were going to rob [Bouchier]." (Dec. 19, 2001 Tr. 58.)

After Bouchier went upstairs, Harbison heard Brandi yelling, so he went upstairs. (Dec. 19, 2001 Tr. 63.) Harbison went upstairs and found two men holding Bouchier down on the bed while Brandi and another man looked on. (Dec. 19, 2001 Tr. 63.) Harbison claimed that it was difficult to identify the men because they had covered their faces with shirts from Brandi's closet. (Dec. 19, 2001 Tr. 64.) Harbison looked on as the men struck Bouchier in the face with a gun and demanded that Bouchier tell them where the marijuana was located. (Dec. 19,

2001 Tr. 65.)  Bouchier was alive and talking to his assailants.
(Dec. 19, 2001 Tr. 67.)  Harbison then went downstairs and left
the house.  (Dec. 19, 2001 Tr. 67-68.)  According to Harbison,
Bouchier was still alive when he left.  (Dec. 19, 2001 Tr. 67-
68, 75.)

The next morning, Brandi called Harbison and told him that
she had shot Bouchier.  (Dec. 19, 2001 Tr. 74.)  Harbison
asserted that he felt guilty for not trying to stop the other
individuals from hurting Bouchier.  (Dec. 19, 2001 Tr. 85.)

## 2. Kia Brooks's Testimony

Kia Brooks ("Kia") testified at trial that she, Herbert
Brown, Jay Walker, Michael Brooks, Brandi Dalton, Dalton's
female roommate and Chris Harbison were at Brandi Dalton's home
on December 6, 2001.  (§ 2254 Pet. Ex. 5, at 20-22, ECF No. 1-
8.)  Brandi mentioned that Bouchier was going out of town and
would likely possess a large sum of money and drugs.  (Id. at
23.)  Harbison came up with a plan whereby Brandi Dalton would
lead Bouchier upstairs while the men would hide in the closet.
(Id. at 23-24.)  Harbison explained that, once Bouchier was
upstairs, the men would jump out and place a pillow case over
Bouchier's head.  (Id. at 24-25.)

Thereafter, Brandi called Bouchier and told the others that
Bouchier was on his way over.  (Id. at 29.)  Brown, Walker,
Michael Brooks, Harbison, and Brandi went upstairs.  (Id. at 29-

30.)   Kia went into the downstairs bathroom and closed the door. (Id. at 30.)   Kia then heard a thud and Bouchier yell out in pain.   (Id. at 31.)   Next, Brandi came downstairs and brought Kia upstairs.   (Id.)

Upstairs, Bouchier was lying face down on the bed with a pillow case over his head and duct tape around his neck.   (Id.) Bouchier's hands were tied and Harbison was holding him down. (Id. at 31-32.)   Harbison demanded to know where Bouchier's money was and slammed Bouchier into the bed.   (Id. at 33.)   Kia then tied Bouchier's ankles.   (Id. at 34.)   The parties agreed to move Bouchier out of the house.   (Id.)

Harbison then lifted Bouchier up out of the bed and moved Bouchier to the landing above the stairs.   (Dalton Sept. 10, 2002 Tr. 128-29.)   Bouchier stood, swaying back and forth, with a bloody pillowcase wrapped around his head.   (Dalton Sept. 10, 2002 Tr. 128.)   Bouchier said that he did not feel well. (Dalton Sept. 10, 2002 Tr. 129.)   Harbison then walked Bouchier down the stairs.   (Dalton Sept. 10, 2002 Tr. 129.)   Once outside of the house, Harbison "walked Mr. Bouchier to the trunk of [Bouchier's] car."   (Dalton Sept. 10, 2002 Tr. 131.)

Michael Brooks drove Bouchier's car with Bouchier in the trunk and Harbison in the passenger seat.   (ECF No. 1-8, at 35.) Brown and Walker followed in Walker's vehicle and Brandi and Kia followed in Kia's car.   (Id. at 36.)   Eventually, Brown and

17

Walker went their own way, while the remaining parties drove to Duval Road. (Id. at 36-37.) At Duval Road, Michael Walker, Brandi and Harbison got out of their cars. (Id. at 37.) Brandi then went around to the back of Bouchier's car, leaned in, and shot the gun once. (Id. at 38.) Brandi paused, then shot four more times. (Id.)

Brandi, Harbison, and Michael Brooks got into Kia's car and drove away. (Id.) Harbison asked Brandi if she was sure Bouchier was dead. (Id.) "Brandi said that when she shot him, he jerked like a worm and she was sure that he was dead." (Id.) Brandi, Harbison, Michael Brooks and Kia Brooks went back to Brandi's house and began to clean up everything that had Bouchier's blood on it. (Id. at 40.)

### 3. Karen Jones

The record shows that Karen Jones was Brandi's neighbor and friend. (Dalton Sept. 10, 2002 Tr. 77.) On December 6, 2001, Brandi told Jones that Bouchier was coming over to Brandi's home and that Harbison and Michael Brooks were going to "beat him up and rob him." (Dalton Sept. 10, 2002 Tr. 78-80.) Although Jones was not at the house at the time of the assault on Bouchier, Brandi later told Jones that she had shot Bouchier. (Dalton Sept. 10, 2002 Tr. 86.)

### 4.   Cardell Banks

While incarcerated in the Riverside Regional Jail, Michael Brooks told fellow inmate, Cardell Banks, what had occurred at Brandi's house.[6]     (Dalton Sept. 11, 2002 Tr. 445-46.) Specifically, Michael Brooks related that he and a white male hid in a closet, then jumped out and duct taped a pillow case over Bouchier's head.   (Dalton Sept. 11, 2002 Tr. 445-46.) Michael Brooks and the white male beat Bouchier and took between $900 and $1,200 from him.   (Dalton Sept. 11, 2002 Tr. 446.) Michael Brooks and the white male then loaded Bouchier into Bouchier's car, and Michael Brooks shot Bouchier.   (Dalton Sept. 11, 2002 Tr. 447.)   Michael Brooks and the white male then agreed to say that Brandi had shot Bouchier.   (Dalton Sept. 11, 2002 Tr. 448.)   Harbison is a white male.

### E.   Evaluation Of All Of The Evidence

At the outset, the Court notes that the recent statements of Michael Brooks and Kia Brooks, which attempt to exculpate

---

[6] At Brandi's bench trial, Banks denied ever telling Brandi's Dalton's private investigator, Jack Davis, about a conversation Banks had with Brooks regarding the robbery and murder of Bouchier.   (Dalton Sept. 11, 2002 Tr. 428-30.)   The Circuit Court then permitted Jack Davis to testify as to the content of his conversation with Banks.   The Circuit Court noted, "that the statement can come in, but not as evidence." (Dalton Sept. 11, 2002 Tr. 443.)   Rather, the Circuit Court stated that it would not "consider the evidence of such inconsistent statements except for the limited purpose of contradicting the witness, the witness being [Mr. Banks]." (Dalton Sept. 11, 2002 Tr. 442-43; see Tr. 445)

Harbison, are quite suspect. See Mabry v. Clarke, No. 1:14cv453 (TSE/IDD), 2015 WL 3545924, at *6 (E.D. Va. June 3, 2015) (observing that post-conviction statements made by other participants in the crime generally fail to constitute reliable evidence of innocence (citing Carter v. Virginia, No. 3:09cv121-HEH, 2010 WL 331758, at *6 (E.D. Va. Jan. 26, 2010)). Neither Kia nor Michael Brooks adequately explained why it took them years to come forward with their present accounts of the robbery and the murder of Bouchier. See McQuiggin v. Perkins, 133 S. Ct. 1924, 1935 (2013) ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing [of innocence]."). Furthermore, Michael Brooks's attempt to exculpate Harbison carries little weight because he fails to accept any responsibility for his role in the crimes for which he stands convicted. See Drew v. Scott, 28 F.3d 460, 463 (5th Cir. 1994) (rejecting actual innocence claim predicated on co-defendant's statements made after he had nothing to lose by exculpating defendant).

The uncontested evidence demonstrates that Harbison participated in driving Bouchier's car from Brandi Dalton's house with Bouchier in the trunk. The strongest evidence of Harbison's innocence is the statements of Anthony Adkins and Torei Rock which suggest that Harbison was absent from Brandi Dalton's home at about the time that the murder and robbery

occurred.[7]  However, a reasonable juror examining the evolution of Harbison's assertion of innocence would conclude that he simply concocted the alibi to align with the favorable forensic evidence that suggested that Bouchier had been shot at least once prior to being placed in the trunk of his vehicle.

For example, although Harbison now asserts that he is actually innocent because he was not present at Brandi's house when Bouchier was robbed and killed, that is not what he first told the police.[8]  During his initial interview with the police,

_____

[7] The fact that Adkins appears to be a convicted felon does not help his credibility.  See http://www.courts.state.va.us/courts/circuit/hampton (select "Case Status and Information;" select "Circuit Court" from drop-down menu; select hyperlink for "Case Information"; select "Chesterfield Circuit" from drop-down menu and follow "Begin" button; type "Adkins, Anthony," and then follow "Search by Name" button; then follow hyperlinks for "CR02F02210-03" (last visited Aug. 17, 2015).

[8] Brandi Dalton also indicated to Harbison's father that his son Charles Harbison was present in her house at the time of robbery and murder.  Furthermore, in his candid statement to the probation office, Harbison admitted to being present for the robbery.  In that statement, Harbison said:

> "There was a plan to rob a person brought on by a codefendant of mine.  To me and the rest of the codefendant[s] that person told us about the person witch [sic] would get robbed.  The person came over then a codefendant said that everyone needed to leave so when they stopped all of a sudden Miss Dalton shot that person without telling them anything.
> All I really have to say is that I was wrong and I'm sorry very much about what happen.  It was a stupid idea for me to stay for the robbery[,] but if I had any idea that this kind of thing could have happened I would have never stayed."

wherein Harbison is clearly attempting to deflect any guilt for the crimes, Harbison, nevertheless, admitted to being present during the planning and the execution of the robbery of Bouchier.   Harbison fails to offer any convincing explanation as to why he would have told the police he was present at the time of the robbery if, in fact, he was not.   Furthermore, although admittedly present at Brandi's home for much of the evening of December 6, 2001, Harbison's current version (that he was absent during the critical window wherein the robbery and murder occurred, but stuck around to dispose of Bouchier's body) stretches credulity.   Rather, the record permits a reasonable juror to conclude that Harbison actively participated in removing Bouchier from Brandi's home and in cleaning up the scene of the robbery to cover up for his participation in the crimes against Bouchier.

Kia Brooks's trial testimony that Harbison helped plan and execute the robbery and the murder is consistent with the other evidence.   For example, the blood on the soles of Bouchier's socks supports Kia Brooks's trial testimony that Harbison walked Bouchier down the stairs after Bouchier had been attacked in the bedroom.[9]   Additionally, Kia Brooks's account of Harbison's

---

Post Sentence Report at 12, Harbison v. Commonwealth, No. CR02F00428-01;-03-06 (Va. Cir. Ct. Feb. 5, 2003).

[9] Kia Brooks's current suggestion that Bouchier already was dead when Harbison moved him down the stairs makes little sense

involvement in the planned robbery of Bouchier is corroborated by Karen Jones. On December 6, 2001, Brandi told Jones that Bouchier was coming over to her home and Harbison and Michael Brooks were going to "beat him up and rob him." (Dalton Sept. 10, 2002 Tr. 78-80.) This unrebutted testimony from an apparently unbiased witness offers convincing support for the fact the Harbison was an instigator and perpetrator of the robbery of Bouchier.[10] See Buckner v. Polk, 453 F.3d 195, 200-201 (4th Cir. 2006) (rejecting claim of actual innocence for a felony murder conviction because petitioner was aware of the planned robbery, participated in the robbery, and then helped conceal the crime). In evaluating Harbison's current claim of innocence, any reasonable juror would give substantial weight to Harbison's prior sworn admissions that he was in fact guilty of the crimes of which he now stands convicted. While he now seeks to recant those admissions, no reasonable juror would give credence to his current assertion of innocence given all of the evidence and Harbison's candid statements to the probation officer of his guilt. Given the totality of the evidence, Harbison failed to demonstrate that "'it is more likely than not

---

and is impossible to square with her prior sworn description of the assault upon Bouchier and Bouchier's removal from Dalton's home.

[10] Cardell Banks's testimony also supports the conclusion that Harbison actively participated in executing the plan to rob Bouchier.

that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Sharpe v. Bell, 593 F.3d 372, 377 (4th Cir. 2010) (quoting Schlup v. Delo, 513 U.S. 298, 327-28 (1995)).

## IV. CONCLUSION

Accordingly, Respondent's Motion to Dismiss (ECF No. 4) will be granted. The § 2254 Petition will be denied and the action will be dismissed. A certificate of appealability will be denied.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion to counsel of record.

It is so ORDERED.

/s/ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 30, 2015